STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
THOMAS STASIO, DEFENDANT-RESPONDENT.

Argued September 11, 1978—Decided January 18, 1979.

*Ms. Ileana N. Saros,* Deputy Attorney General, argued the cause for appellant (*Mr. John J. Degnan,* Attorney General

of New Jersey, attorney; *Ms. Susan W. Sciacca,* Deputy Attorney General, of counsel and on the briefs).

*Mr. Arnold Lakind,* Designated Counsel, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivered by

SCHREIBER, J. The major issue on this appeal is whether voluntary intoxication constitutes a defense to a crime, one element of which is the defendant's intent. Defendant Stasio was found guilty by a jury of assault with intent to rob, in violation of *N. J. S. A.* 2A:90–2, and of assault while being armed with a dangerous knife, contrary to *N. J. S. A.* 2A:151–5. The trial court sentenced the defendant to three to five years on the assault with intent to rob count and a concurrent term of one to two years on the second count. The prison term was suspended and the defendant was placed on probation for three years. The Appellate Division reversed the convictions and ordered a new trial. We granted the State's petition for certification. 75 *N. J.* 613 (1978).

The scene of this incident was the Silver Moon Tavern located at 655 Van Houten Avenue, Clifton. The date was October 7, 1975. The defendant having presented no evidence, what occurred must be discerned from the testimony of three witnesses for the State: Peter Klimek, a part owner of the Silver Moon; Robert Colburn, a patron; and Robert Rowan, a member of the Clifton police force.

Robert Colburn had frequented the Silver Moon Tavern not only for its alcoholic wares but also to engage in pool. On October 7, Colburn arrived at the Tavern about 11:00 A.M. and started to play pool. Sometime before noon the defendant joined him. They stayed together until about 3:00 P.M. when the defendant left the bar. Though the defendant had been drinking during this period, in Colburn's opinion the defendant was not intoxicated upon his departure. Neither

the defendant's speech nor his mannerisms indicated drunkenness.

Peter Klimek arrived at the Tavern shortly before 5:00 P.M. and assumed his shift at tending bar. There were about eight customers present when, at approximately 5:40 P.M., the defendant entered and walked in a normal manner to the bathroom. Shortly thereafter he returned to the front door, looked around outside and approached the bar. He demanded that Klimek give him some money. Upon refusal, he threatened Klimek. The defendant went behind the bar toward Klimek and insisted that Klimek give him $80 from the cash register. When Klimek persisted in his refusal, the defendant pulled out a knife. Klimek grabbed the defendant's right hand and Colburn, who had jumped on top of the bar, seized the defendant's hair and pushed his head toward the bar. The defendant then dropped the knife.

Almost immediately thereafter Police Officer Rowan arrived and placed the defendant in custody. He testified that defendant responded to his questions with no difficulty and walked normally. Klimek also stated that defendant did not appear drunk and that he had not noticed any odor of alcohol on defendant's breath.

At the conclusion of the State's case, the defendant elected not to take the stand. He made this decision because of an earlier conference in chambers[1] at which defense counsel had advised the court that his defense would be that defendant had been so intoxicated that he was incapable of forming the intent to rob. The trial court responded by stating that it would charge that "voluntary intoxication was not a defense to any act by the defendant in this matter." The defendant on a *voir dire* made it clear that his decision not to testify was predicated upon the trial court's position. It might be noted that the defendant had no record of prior convictions.

---

[1]Contrary to *R.* 1:2–2, these proceedings were not recorded.

Holding that the trial court's declaration in view of the defendant's proffer of proof was erroneous, the Appellate Division reversed the convictions and ordered a new trial. The Appellate Division reasoned that specific intent is an essential element of the crime of an assault with intent to rob and that voluntary intoxication may be shown to negate that element of the offense.

This Court last considered the culpability of an individual who had committed an illegal act while voluntarily under the influence of a drug or alcohol in *State v. Maik,* 60 *N. J.* 203 (1972). There the defendant Maik had been charged with the first degree murder of his friend, a fellow college student. The defense was insanity at the time of the killing. Evidence at the trial had suggested that the defendant was schizophrenic and that a psychotic episode may have been triggered by the defendant's voluntary use of LSD or hashish. The trial court had charged the jury that if it found that the underlying psychosis had been activated by the voluntary use of either narcotic, the defense of insanity would not stand.

On appeal Chief Justice Weintraub, writing for a unanimous Court, began by discussing generally the concept of criminal responsibility. After pointing out that although there was a difference in the treatment of sick and bad offenders, he noted that notwithstanding that difference "the aim of the law is to protect the innocent from injury by the sick as well as the bad." 60 *N. J.* at 213. It was in that context that a decision would have to be made whether the vountary use of alcoholic beverages or drugs should support a viable defense. He then stated the generally accepted proposition that criminal responsibility was not extinguished when the offender was under the influence of a drug or liquor and the reasons for that rule:

It is generally agreed that a defendant will not be relieved of criminal responsibility because he was under the influence of intoxicants or drugs voluntarily taken. This principle rests upon public policy, demanding that he who seeks the influence of liquor or

narcotics should not be insulated from criminal liability because that influence impaired his judgment or his control. The required element of badness can be found in the intentional use of the stimulant or depressant. Moreover, to say that one who offended while under such influence was sick would suggest that his sickness disappeared when he sobered up and hence he should be released. Such a concept would hardly protect others from the prospect of repeated injury. [60 *N. J.* at 214]

The Chief Justice set forth four exceptions to the general rule. First, when drugs being taken for medication produce unexpected or bizarre results, no public interest is served by punishing the defendant since there is no likelihood of repetition. Second, if intoxication so impairs a defendant's mental faculties that he does not possess the wilfulness, deliberation and premeditation necessary to prove first degree murder, a homicide cannot be raised to first degree murder. *State v. Sinclair,* 49 *N. J.* 525, 544 (1967) ; *State v. Trantino,* 44 *N. J.* 358, 369 (1965), *cert.* den. 382 *U. S.* 993, 86 *S. Ct.* 573, 15 *L. Ed.* 2d 479 (1966). Under this exception the influence of liquor "no matter how pervasive that influence may be, will not lead to an acquittal. It cannot reduce the crime below murder in the second degree, and this because of the demands of public security." *State v. Maik, supra,* 60 *N. J.* at 215. Third, a felony homicide will be reduced to second degree murder when intoxication precludes formation of the underlying felonious intent. Parenthetically, it may be noted that since voluntary intoxication does not eliminate responsibility for the felony, it could be contended that the defendant should remain liable for first degree felony murder. On the other hand, considerations of fairness indicate that such a defendant should be treated the same as one charged with ordinary first degree homicide requiring premeditation. Fourth, the defense of insanity is available when the voluntary use of the intoxicant or drug results in a fixed state of insanity after the influence of the intoxicant or drug has spent itself. Since the defense in *Maik* may have fallen into the fourth category, the charge as given was

erroneous and the cause was remanded for a new trial on the issue of whether the defendant had been insane at the time of the killing and whether that condition continued thereafter.

A difference of opinion has been expressed in the Appellate Division as to the meaning of Chief Justice Weintraub's discussion of intoxication in *Maik*. In *State v. Del Vecchio*, 142 *N. J. Super*. 359 (App. Div.), certif. den. 71 *N. J.* 501 (1976), a conviction for breaking and entering with intent to steal was reversed on the ground that the jury had improperly been charged that voluntary intoxication was not a defense to a crime requiring a specific intent. The Appellate Division reasoned that, when a specific intent was an element of an offense, voluntary intoxication may negate existence of that intent. Since intoxication may have prevented existence of that specific intent, an acquittal might be in order. The Appellate Division also held that the only principle to be derived from *Maik* was the proposition that voluntary intoxication may be relevant in determining whether a murder may be raised to first degree. In contrast, Judge Allcorn's dissent in *State v. Atkins*, 151 *N. J. Super*. 555, 573 (App. Div. 1977), rev'd 78 *N. J.* 454 (1979), expresses the opinion that *Maik* stands for the proposition that voluntary intoxication is not a defense to any criminal offense irrespective of whether a specific or general intent is an element of the offense.

In our opinion the Chief Justice in *Maik* enunciated a principle applicable generally to all crimes and, unless one of the exceptions to the general rule is applicable, voluntary intoxication will not excuse criminal conduct. The need to protect the public from the prospect of repeated injury and the public policy demanding that one who voluntarily subjects himself to intoxication should not be insulated from criminal responsibility are strongly supportive of this result. We reject the approach adopted by *Del Vecchio* because, although it has surface appeal, it is based

on an unworkable dichotomy, gives rise to inconsistencies, and ignores the policy expressed in *Maik*.

*Del Vecchio* would permit the intoxication defense only when a "specific" as distinguished from a "general" intent was an element of the crime. However, that difference is not readily ascertainable. "The distinction thus made between a 'specific intent' and a 'general intent,' " wrote the Chief Justice in *Maik*, "is quite elusive, and although the proposition [that voluntary intoxication may be a defense if it prevented formation of a specific intent] is echoed in some opinions in our State, see *State v. White*, [27 *N. J.* 158, 165–167 (1958)]; *cf. State v. Letter*, 4 *N. J. Misc.* 395, 133 *A.* 46 (Sup. Ct. 1926), it is not clear that any of our cases in fact turned upon it." 60 *N. J.* at 214–215. Professor Hall has deplored the attempted distinction in the following analysis:

> The current confusion resulting from diverse uses of "general intent" is aggravated by dubious efforts to differentiate that from "specific intent." Each crime * * * has its distinctive *mens rea*, *e. g.* intending to have forced intercourse, intending to break and enter a dwelling-house and to commit a crime there, intending to inflict a battery, and so on. It is evident that there must be as many *mentes reae* as there are crimes. And whatever else may be said about an intention, an essential characteristic of it is that it is directed towards a definite end. To assert therefore that an intention is "specific" is to employ a superfluous term just as if one were to speak of a "voluntary act." [*J. Hall, General Principles of Criminal Law* 142 (2d ed. 1960)]

For a similar analysis see *People v. Hood*, 1 *Cal.* 3d 444, 456–457, 82 *Cal. Rptr.* 618, 625–626, 462 *P.* 2d 370, 377–378 (1969). The same point is made in *G. Williams, Criminal Law—The General Part* (2d ed. 1961):

> The adjective "specific" seems to be somewhat pointless, for the intent is no more specific than any other intent required in criminal law. The most that can be said is that the intent is specifically referred to in the indictment. There is no substantive difference between an intent specifically mentioned and one implied in the name of the crime. [*Id.* at 49]

The undeniable fact is "that neither common experience nor psychology knows any such actual phenomenon as 'general intent' that is distinguishable from 'specific intent.'" Hall, "Intoxication and Criminal Responsibility," 57 *Harv. L. Rev.* 1045, 1064 (1944).

Moreover, distinguishing between specific and general intent gives rise to incongruous results by irrationally allowing intoxication to excuse some crimes but not others. In some instances if the defendant is found incapable of formulating the specific intent necessary for the crime charged, such as assault with intent to rob, he may be convicted of a lesser included general intent crime, such as assault with a deadly weapon. *N. J. S. A.* 2A:90–3. In other cases there may be no related general intent offense so that intoxication would lead to acquittal. Thus, a defendant acquitted for breaking and entering with intent to steal because of intoxication would not be guilty of any crime—breaking and entering being at most under certain circumstances the disorderly persons offense of trespass. *N. J. S. A.* 2A:170–31. Similarly, if the specific intent to rob were not demonstrated because of intoxication, then the defendant may have no criminal responsibility since assault with intent to rob would also be excused.

Finally, where the more serious offense requires only a general intent, such as rape, see *J. Hall, General Principles of Criminal Law* 143 (2d ed. 1960), and sources cited, intoxication provides no defense, whereas it would be a defense to an attempt to rape, specific intent being an element of that offense. Yet the same logic and reasoning which impels exculpation due to the failure of specific intent to commit an offense would equally compel the same result when a general intent is an element of the offense.[2]

---

[2]Some form of *mens rea* is an element of all offenses except strict liability crimes. See *State v. Savoie,* 67 *N. J.* 439, 454–461 (1975).

One commentator summed up the situation in the following way:

For example, if the defendant is found incapable of formulating the specific intent necessary for the crime with which he is charged, he may be convicted instead of a lesser included general intent offense. Yet in some cases there may be no related general intent offense on which conviction can be based, and complete acquittal will result. *See, e. g.*, People v. Jones, 263 Ill. 564, 105 N. E. 744 (1914) (attempted burglary) ; Hall, [*Intoxication and Criminal Responsibility*, 57 Harv. L. Rev. 1045, 1062 (1944)]. Thus, the intoxicated offender may be denied exculpation, receive partial exculpation, or receive total exculpation, depending upon the nature of the crime with which he is charged. As one commentator concludes: "It is thus apparent that the criminal liability of the grossly intoxicated offender depends upon the crime fortuitously committed while incapacitated." Note, *Volitional Fault and the Intoxicated Criminal Offender*, 36 U. Cin. L. Rev. 258, 276 (1967). [Comment, 61 *Minn. L. Rev.* 901, 904 n. 14 (1977)]

The *Del Vecchio* approach may free defendants of specific intent offenses even though the harm caused may be greater than in an offense held to require only general intent. This course thus undermines the criminal law's primary function of protecting society from the results of behavior that endangers the public safety. This should be our guide rather than concern with logical consistency in terms of any single theory of culpability, particularly in view of the fact that alcohol is significantly involved in a substantial number of offenses.[3] The demands of public safety and the harm done are identical irrespective of the offender's reduced

---

[3]See Wilentz, "The Alcohol Factor in Violent Deaths," 12 *Am. Pract. Digest* 829 (1961) ; Goodwin, Crane & Guze, "Felons Who Drink," 32 *Q. J. Stud. Alc.* 136 (1971) ; McGeorge, "Alcohol and Crime," 3 *Med. Sci. & L.* 27 (1963). A study in 77 rape cases reflected that 50% of the offenders had been drinking. Rada, "Alcoholism and Forcible Rape," 132 *Am. J. Psychiatry* 4 (1975). Analysis of many studies reflects a high ratio of offenders who have imbibed to those who have not in violent crimes. See K. Pernanen, "Alcohol and Crimes of Violence," in 4 *The Biology of Alcoholism* 351 (B. Kissin & H. Begleiter eds. 1976).

ability to restrain himself due to his drinking.[4] "[I]f a person casts off the restraints of reason and consciousness by a voluntary act, no wrong is done to him if he is held accountable for any crime which he may commit in that condition. Society is entitled to this protection." *McDaniel v. State,* 356 *So.* 2d 1151, 1160–1161 (Miss. 1978).

 Until a stuporous condition is reached or the entire motor area of the brain is profoundly affected,[5] the probability of the existence of intent remains. The initial effect of alcohol is the reduction or removal of inhibitions or restraints. But that does not vitiate intent. The loosening of the tongue has been said to disclose a person's true sentiments—*"in vino veritas."* One commentator has noted:

> The great majority of moderately to grossly drunk or drugged persons who commit putatively criminal acts are probably aware of what they are doing and the likely consequences. In the case of those who are drunk, alcohol may have diminished their perceptions, released their inhibitions and clouded their reasoning and judgment, but they still have sufficient capacity for the conscious mental processes required by the ordinary definitions of all or most specific *mens rea* crimes. For example, a person can be quite far gone in drink and still capable of the conscious intent to steal, which is an element of common law larceny. [Murphy, "Has Pennsylvania Found a Satisfactory Intoxication Defense?", 81 *Dick. L. Rev.* 199, 208 (1977) (citations omitted)]

---

[4]This position is consistent with the treatment accorded voluntary intoxication in tort law. *Restatement (Second) of Torts* § 283C, Comment d (Tentative Draft No. 4, 1959); *W. Prosser, Torts* § 32 at 154 (4th ed. 1971).

[5]There is some evidence that at 0.20% of alcohol in the blood, the typical individual would normally fall into that category. Greenberg, "Intoxication and Alcoholism: Physiological Factors," 315 *Annals Am. Acad. Pol. & Soc. Sci.* 22, 27 (1958). The motor vehicle statute presumes a driver is under the influence of liquor if the percentage is 0.10% or more. *N. J. S. A.* 39:4–50.1(3). Of course, the precise effects of a particular concentration of alcohol in the blood varies from person to person depending upon a host of other factors. See generally Perr, "Blood Alcohol Levels and 'Diminished Capacity'," 3 (No. 4) *J. Legal Med.* 28–30 (April 1975).

When a defendant shows that he was comatose and therefore could not have broken and entered into the home or committed some other unlawful activity, such stage of intoxication may be relevant in establishing a general denial. But short of that, voluntary intoxication, other than its employment to disprove premeditation and deliberation in murder, should generally serve as no excuse. In this fashion the opportunities of false claims by defendants may be minimized and misapplication by jurors of the effect of drinking on the defendant's responsibility eliminated.

The significance of the common law approach to voluntary intoxication should not be overlooked. Our criminal law is grounded in large measure in the common law because of its incorporation by our constitutions and statutes.[6] Our first constitution expressly included the common and statutory laws of England. *N. J. Const.* (1776), par. 22. This incorporated by reference has been retained in subsequent constitutions. *N. J. Const.* (1844), Art. X, par. 1; *N. J. Const.*

---

[6]An argument could be made that the substance of our criminal law, unless modified by the Legislature, remained frozen in the status in which it existed when the Constitution was adopted. Authority for this premise might be found in the positions of Vermont Chief Justice Chipman and Supreme Court Justice Johnson. The Vermont Chief Justice wrote in 1793 that "no Court, in this State, ought ever to pronounce sentence of death upon the authority of a common law precedent, without the authority of a Statute." *Dissertation on the Act Adopting the Common and Statute Laws of England*, quoted in *M. Horwitz, The Transformation of American Law 1780–1860* 14 (1977). Supreme Court Justice William Johnson asserted that in the colonies "the adoption of the Common Law [of crimes] depended upon the voluntary act of the legislative power of the several States." *The Trial of William Butler for Piracy* (1813?) quoted in *Horwitz, op. cit.* at 15. See *J. Goodenow, Historical Sketches of the Principles and Maxims of American Jurisprudence* (1819), quoted in *Horwitz, op. cit.* at 15–16.

We have not accepted this proposition. In *State v. Toscano*, 74 *N. J.* 421, 432 (1977), Justice Pashman commented, "[W]e are guided only by common law principles which conform to the purposes of our criminal justice system and reflect contemporary notions of justice and fairness."

(1947), Art. XI, § I, par. 3. See *State v. Young,* 77 *N. J.* 245, 249–250 (1978).

The Legislature has followed this pattern since 1796 by stating that all offenses of an indictable nature at common law that are not expressly provided for by statute are crimes. An Act for the Punishment of Crimes, par. 68, adopted March 18, 1796 (*Laws of New Jersey* 244, 262 (1821)); *N. J. S. A.* 2A:85–1. See *State v. Bynes,* 109 *N. J. Super.* 105 (App. Div. 1969), aff'd o.b. 55 *N. J.* 408 (1970).

At common law voluntary intoxication was not a defense. The earliest pronouncement is found in *Reniger v. Fogossa,* 1 *Plow.* 1, 19, 75 *Eng. Rep.* 1, 31 (Exch. Ch. 1551), which reads:

> But where a man breaks the words of the law by involuntary ignorance, there he shall not be excused. As if a person that is drunk kills another, this shall be felony, and he shall be hanged for it, and yet he did it through ignorance, for when he was drunk he had no understanding nor memory; but inasmuch as that ignorance was occasioned by his own act and folly, and he might have avoided it, he shall not be privileged thereby. And Aristotle says, that such a man deserves double punishment, because he has doubly offended, viz. in being drunk to the evil example of others, and in committing the crime of homicide. And this act is said to be done *ignoranter,* for that he is the cause of his own ignorance: and so the diversity appears between a thing done *ex ignorantia,* and *ignoranter.* [Citations omitted]

See Singh, "History of the Defence of Drunkenness in English Criminal Law," 49 *L. Q. Rev.* 528, 530 (1933). That remained the unwritten law at the time New Jersey attained statehood. For development of the law in England see *Director of Public Prosecutions v. Beard,* [1920] *A. C.* 479, 12 *A. L. R.* 846. Our holding today adheres to the central theme of that principle modified only by contemporary circumstances including scientific data on physiological effects of alcohol and our notions of fairness and rightness.

It might be suggested with some justification that we should adhere to the policy expressed in the new Code of Criminal Justice, effective September 1, 1979, *N. J. S. A.*

2C:98–4. However, the Deputy Attorney General implied at oral argument that the Legislature would be requested to modify the provisions dealing with intoxication and, in view of the possibility that the Legislature might act, in the interim we prefer to adhere to the principle enunciated in *Maik*. We note that in Arkansas, a law based on the Model Penal Code's provision for a defense of voluntary intoxication was repealed less than two years after it was enacted. *Ark. Stat. Ann.* § 41–207 (1977). The repealing legislation was made effective immediately by a finding of emergency which read in part "that the defense of voluntary intoxication is detrimental to the welfare and safety of the citizens of this State in that criminals are at times excused from the consequences of their criminal acts merely because of their voluntary intoxication \* \* \*." 1977 *Ark. Acts, No.* 101, § 3. Similarly, Pennsylvania first enacted but then repealed a voluntary intoxication defense which was substantially the same as in the Model Penal Code. 18 *Pa. Cons. Stat. Ann.* § 308 (Purdon Supp. 1978) (prior version at 1972 *Pa. Laws, No.* 334).

The new Code of Criminal Justice provides that a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require. *N. J. S. A.* 2C:2–2. It also states that intoxication is not a defense "unless it negatives an element of the offense," *N. J. S. A.* 2C:2–8(a), and that "[w]hen recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." *N. J. S. A.* 2C:2–8(b). These provisions were taken from the Model Penal Code of the American Law Institute, § 2.08 (Prop. Off. Draft 1962). The American Law Institute Committee has explained that in those instances when the defendant's purpose or knowledge is an element of a crime, proof of intoxication may negate the existence of either. Tent. Draft No. 9 at 2–9 (1959). The

distinction between specific and general intent has been rejected. *Id.* at 4.

▮▮▮ Purpose or knowledge has been made a component of many offenses so that voluntary intoxication will be an available defense in those situations. Thus, voluntary intoxication may be a defense to aggravated assaults consisting of attempts to cause bodily injury to another with a deadly weapon. *N. J. S. A.* 2C:12–1(b)(2). Intoxication could exonerate those otherwise guilty of burglaries and criminal tresspass. *N. J. S. A.* 2C:18–2; 2C:18–3. It would be an available defense to arson, *N. J. S. A.* 2C:17–1, robbery, *N. J. S. A.* 2C:19–1, and theft, *N. J. S. A.* 2C:20–3. It could reduce murder to manslaughter, *N. J. S. A.* 2C:11–3, 2C:11–4, and excuse shoplifting, *N. J. S. A.* 2C:20–11(b). The Code would also permit the incongruous result of permitting intoxication to be a complete defense to an attempted sexual assault (rape), *N. J. S. A.* 2C:5–1, but not of a completed sexual assault, *N. J. S. A.* 2C:14–2. Whether the Legislature will retain any or all these provisions remains to be seen.

▮▮▮ Our holding today does not mean that voluntary intoxication is always irrelevant in criminal proceedings.[7] Evidence of intoxication may be introduced to demonstrate that premeditation and deliberation have not been proven so

---

[7]While we recognize that the rule we announce here is at odds with the rule in a number of other jurisdictions, see Annot., 8 *A. L. R.* 3d 1236 (1966), it is in accord with the holding in several other states. See *McDaniel v. State*, 356 *So.* 2d 1151 (Miss. 1978) (armed robbery; court made rule); *State v. Vaughn*, 268 *S. C.* 119, 232 *S. E.* 2d 328 (1977) (house-breaking and assault with intent to ravish; court made rule); *Commonwealth v. Geiger*, 475 *Pa.* 249, 380 *A.* 2d 338 (1977) (by statute); *McKenty v. State*, 135 *Ga. App.* 271, 217 *S. E.* 2d 388 (1975) (by statute); *State v. Cornwall*, 95 *Idaho* 680, 518 *P.* 2d 863 (1974) (by statute); *Rodriquez v. State*, 513 *S. W.* 2d 594 (Tex. Crim. App. 1974) (by statute); *State v. Richardson*, 495 *S. W.* 2d 435 (Mo. 1973) (second degree murder; court made rule); *Chittum v. Commonwealth*, 211 *Va.* 12, 174 *S. E.* 2d 779 (1970) (kidnapping and attempted rape; court made rule). See also *Ark. Stat. Ann.* § 41–207 (1977), discussed *supra* at 481.

that a second degree murder cannot be raised to first degree murder or to show that the intoxication led to a fixed state of insanity. Intoxication may be shown to prove that a defendant never participated in a crime. Thus it might be proven that a defendant was in such a drunken stupor and unconscious state that he was not a part of a robbery. See *State v. Letter,* 4 *N. J. Misc.* 395, 133 *A.* 46 (Sup. Ct. 1926). His mental faculties may be so prostrated as to preclude the commission of the criminal act. Under some circumstances intoxication may be relevant to demonstrate mistake. However, in the absence of any basis for the defense, a trial court should not in its charge introduce that element. A trial court, of course, may consider intoxication as a mitigating circumstance when sentencing a defendant.

Although the evidence in the record demonstrates that the defendant assaulted Klimek while possessed with a knife and that his mental faculties were not prostrated, we are disturbed by the trial court's ruling which precluded the defendant from taking the stand. Defense counsel's proffer of proof that the defendant had been in the tavern between 7:00 A.M. and 5:30 P.M., that he had been drinking most of the day, and that he did not remember anything about the offense could possibly lead to the conclusion that he did not commit the assault. In that event the effect of the voluntary intoxication would demonstrate a denial of the assault. However, if the attack did occur, then the voluntary intoxication would not serve as a defense, even though the defendant could not remember the event. It would have been far better practice for the trial court not to have made its ruling at some unrecorded conference in chambers. The court should have waited until the issue was reached at trial when evidence of intoxication was offered. Permitting defendants to withhold evidence because of an expected jury instruction focuses the trial on appellate review rather than on producing the evidence at the trial. As the Attorney General cogently comments in his brief, "Any defendant who is dissatisfied with the state of the law could refrain from presenting proofs, take

his chance with the verdict and, if found guilty, have a potential defense preserved on appeal." Under the circumstances here, we are constrained to grant the defendant a new trial.

The defendant also contends that the trial court erred when it charged:

Our law provides that one who commits or attempts to commit a robbery when armed with or having in his possession any dangerous knife shall in addition to the punishment provided for the crime be punished by a further punishment. Our law further provides that in the trial of a person for attempting to commit robbery the fact that he [was] armed with or had in his possession any dangerous instrument is *prima facie* evidence of his intention to commit the crime with the dangerous instrument. Here again the burden of proof is on the State to prove the allegation of the second count beyond a reasonable doubt. This burden never shifts. [Emphasis supplied]

Defense counsel, relying upon *State v. Humphreys, 54 N. J.* 406 (1969), excepted to the court's assertion that possession of the knife was prima facie evidence of intent to commit the crime. The narrow issue raised is the alleged impropriety of the use of the phrase prima facie, the defendant having acknowledged the applicability of *N. J. S. A.* 2A:151–6 which recites that possession of a dangerous instrument (defined to include a knife, *N. J. S. A.* 2A:151–5) "is prima facie evidence of his intention to commit said crime with said * * * dangerous instrument."

In *State v. Humphreys, supra,* the trial court charged the language of *N. J. S. A.* 2A:151–7, "The presence of a firearm * * * in a vehicle is presumptive evidence of possession by all persons occupying the vehicle at the time." This was held to be error. The Court, noting the distinction between a presumption and an inference, stated that a jury must be carefully informed that it is within the jury's province to decide whether an inference may and should be drawn from the facts and that the jury could have been

misled by use of the term "presumptive evidence." 54 *N. J.* at 415.

Though the word "presumption" or one similar to it was not used in the charge in this case, and we find that *State v. Humphreys, supra,* is not apposite, a trial court should not assume that jurors have a correct understanding of the phrase "prima facie." *State v. Ruggiero,* 41 *N. J.* 4, 6 (1963). Better practice dictates that such a phrase be eliminated. The jury should be instructed in terms of inferences which may or may not be drawn from a fact, the jury being at liberty to find the ultimate fact one way or the other.

The judgment of the Appellate Division is affirmed.

HANDLER, J., concurring. If a defendant's state of mind is a material factor in determining whether a particular crime has been committed — and if a degree of intoxication so affects the defendant's mental faculties as to eliminate effectively a condition of the mind otherwise essential for the commission of a crime — intoxication should be recognized as a defense in fact.

When dealing with the issue of intoxication, the focus at trial should be upon the mental state which is required for the commission of the particular crime charged. This should not ordinarily call for desiccated refinements between general intent and specific intent. I subscribe to the reasoning expressed in *State v. Maik,* 60 *N. J.* 203 (1972), and endorsed by this Court, which denigrated the attempted differentiation between so-called specific intent and general intent crimes. It is an unhelpful, misleading and often confusing distinction. See *People v. Hood,* 1 *Cal.* 3d 444, 456–457, 462 *P.* 2d 370, 377–378, 82 *Cal. Rptr.* 618, 625–626 (1969); *J. Hall. General Principles of Criminal Law* 142 (2d ed. 1960); *G. Williams, Criminal Law — The General Part* (2d ed. 1961); Hall, "Intoxication and Criminal Responsibility", 57 *Harv. L. Rev.* 1045, 1064 (1944), authorities cited by the majority *opinion. Ante* at 475–476. For the most part, the inquiry

at a criminal trial should be directed toward the general guilty condition of mind or *mens rea* necessary to append responsibility for criminal conduct. See *State v. Savoie,* 67 *N. J.* 439, 454–461 (1975).

Adherence to the distinction between specific and general intent crimes, and the availability of voluntary intoxication as a defense in terms of that distinction, has led to anomalous results. See Annot., "Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge", 8 *A. L. R.* 3d 1236 (1966); for example, compare *State v. Frankland,* 51 *N. J.* 221 (1968) (intoxication is a defense to a statutory criminal charge of burning with intent to burn) with *State v. Kinlaw,* 150 *N. J. Super.* 70, 73 (App. Div. 1977) (intoxication is not a defense to a statutory charge of wilfully and maliciously burning). Inconsistent applications of the intoxication defense and disparate results can be avoided or reduced by rejecting the dichotomy between specific intent and general intent crimes.

The Model Penal Code of the American Law Institute has eschewed this distinction. It deals with *mens rea* primarily in terms of purpose and knowledge and calls for an analysis of the elements of the criminal offense in relation to these components. See Model Penal Code § 2.02, Comments (Tent. Draft No. 4, 1955); *Id.,* § 2.08, Comments (Tent. Draft No. 9, 1959). The recently enacted New Jersey Code of Criminal Justice, *N. J. S. A.* 2C:1–1 *et seq.,* similarly abandons the distinctions between specific and general intent in addressing the area of the mental components of crime. *N. J. S. A.* 2C:2–2. This approach, in my view, enables a trier of fact to assimilate proof of a defendant's intoxication in a more realistic perspective and to reach a more rational determination of the effect of intoxication upon criminal responsibility, particularly in terms of consciousness and purpose. *N. J. S. A.* 2C:2–2.

On this point, the majority disapproves of the decision of the Appellate Division in *State v. Del Vecchio,* 142 *N. J. Super.* 359 (App. Div.), certif. den. 71 *N. J.* 501 (1976).

*Ante* at 474–475. I also disavow that decision to the extent it maintains the distinction between specific intent and general intent crimes and determines the availability of voluntary intoxication as a defense based upon that distinction. I do not think it follows, however, that if the separation between so-called specific and general intent crimes is rejected, voluntary intoxication as a factual defense must also be rejected.

The majority of this Court repudiates the intoxication defense on grounds of general deterrence and a ubiquitous need to protect society from drunken criminals. This approach mirrors a commendable impulse, which I share. But, it fails to consider that enforcement of the criminal law must be fair and just, as well as strict and protective.

The criminal laws need not be impotent or ineffective when dealing with an intoxicated criminal. The question should always be whether under particular circumstances a defendant ought to be considered responsible for his conduct. This involves a factual determination of whether he has acted with volition. Intoxication, in this context, would constitute a defense if it reached such a level, operating upon the defendant's mind, so as to deprive him of his will to act. *Cf. State v. King,* 37 *N. J.* 285, 297–298 (1962). I would accordingly require, in order to generate a reasonable doubt as to a defendant's responsibility for his acts, that it be shown he was so intoxicated that he could not think, or that his mind did not function with consciousness or volition. *Cf. State v. Ghaul,* 132 *N. J. Super.* 438, 440 (App. Div. 1975); *State v. Turley,* 113 *R. I.* 104, 318 *A.* 2d 455 (Sup. Ct. 1974) (intoxication must be so extreme as to paralyze the will of defendant); *State v. Gover,* 267 *Md.* 602, 298 *A.* 2d 378 (Ct. App. 1973) (intoxication that suspends defendant's reasoning abilities constitutes a defense); also *State v. Bindhammer,* 44 *N. J.* 372 (1965); *State v. Trantino,* 44 *N. J.* 358 (1965), *cert.* den. 382 *U. S.* 993, 86 *S. Ct.* 573, 15 *L. Ed.* 2d 479 (1966); *State v. King, supra* 37 *N. J.* at 296–297 (homicide prosecutions).

I disagree therefore with the suggestion by the Court that if voluntary intoxication is recognized as a defense, as it is under the recently enacted New Jersey Code of Criminal Justice, *N. J. S. A.* 2C:2–8, it will serve to excuse criminal conduct with respect to which purpose or knowledge is a component. *Ante* at 482 I do not share the pessimism of the Court that voluntary intoxication as a recognized defense will wreak havoc in criminal law enforcement under the New Jersey Criminal Justice Code. The fear of condoning criminals, who are also drunks, can be addressed, I respectfully suggest, by imposing a heavy burden of proof upon defendants to show a degree of intoxication capable of prostrating the senses. Drunkenness which does not have this effect does not diminish responsibility and should not serve to excuse criminality. I think it amiss therefore for this Court to forewarn the Legislature. *Ante* at 480–482, on the basis of its own dire prognostications as to the applications of the statutory intoxication defense contemplated under the New Jersey Criminal Justice Code.

In this case, the crime with which defendant was charged is denominated by the statute, *N. J. S. A.* 2A:90–2, as assault with intent to rob. It serves no useful end to describe the mental state necessary to sustain the charge as a "specific intent" in contradistinction to a "general intent" to do the particular acts revealed by the evidence. I am satisfied that under any formulation of the elements of the crime, defendant on these facts could not be exonerated for reasons of intoxication. The facts, which are fully set forth in the Court's opinion, *Ante* at 470–471, reveal that defendant engaged in volitional, purposeful activity — he assaulted his victim with a knife and at the same time unmistakably expressed his purpose by demanding that his victim turn over $80 from the cash register. He had the requisite *mens rea* for affixing criminal responsibility. The evidence of defendant's drinking during the day and before the assault is relevant, of course, to the question of whether he was intoxicated when he committed this crime. But, in light of his unequivocal

assault on the bartender with a knife and his loud and clear demand for money from the cash register, the evidence of intoxication was palpably insufficient to negate the volitional character of the defendant's behavior. Juxtaposed against such overwhelming and clear evidence of purposeful criminal conduct, only intoxication which prostrated the defendant's faculties or deprived him of will would justify his acquittal.

Was defendant nevertheless entitled to have the jury consider the evidence of intoxication as a factor relevant to his commission of the charged crime? Evidence of intoxication, which may under some circumstances be inferred from prolonged, continuous, heavy drinking, should ordinarily entitle a defendant to a charge of intoxication as a factual defense bearing upon his mental state and whether he acted without purpose or volition. *E. g., State v. Frankland, supra; State v. Sinclair,* 49 *N. J.* 525 (1967); *State v. Hudson,* 38 *N. J.* 364 (1962); *State v. King, supra.* The charge on intoxication, however, should explain to the jury that unless defendant's intoxication was sufficiently extreme so as to have deprived him of his will to act and ability to reason, and prevented him in fact from having a purpose to rob the bartender, he would not, on this ground, be entitled to an acquittal. The jury, moreover, should be admonished to consider and weigh the evidence of intoxication with great caution. See *State v. Tune,* 17 *N. J.* 100, 114–115 (1954), *cert.* den. 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955).

In another context, I would be inclined to consider the ruling of the trial judge in rejecting the asserted defense of intoxication as harmless error since under the strong evidence of guilt, it would not have affected the jury's ultimate verdict. See *State v. Atkins,* 78 *N. J.* 454 (1979), (Handler, J., concurring), decided this day. But, the Court's ruling in this case occurred during the trial. It altered defendant's fundamental trial strategy and induced him not to take the stand. The ruling, therefore, had an effect beyond the sole issue of intoxication and its impact upon

the ultimate outcome of the trial is an imponderable. The fair course of action, therefore, is a new trial.

In voting with the majority, for the reasons given, I likewise express my agreement with its observations as to the proper instruction involving the phrase "prima facie" in relation to the possession by defendant of a dangerous knife.

Justice CLIFFORD joins in this opinion.

PASHMAN, J., concurring in result only and dissenting. In this and the companion case of *State v. Atkins,* 78 *N. J.* 454 (1979), the majority rules that a person may be convicted of the crimes of assault *with intent* to rob and breaking and entering *with intent* to steal even though he never, in fact, intended to rob anyone or steal anything. The majority arrives at this anomolous result by holding that voluntary intoxication can never constitute a defense to any crime other than first-degree murder even though, due to intoxication, the accused may not have possessed the mental state specifically required as an element of the offense. This holding not only defies logic and sound public policy, it also runs counter to dictates of prior caselaw and the policies enunciated by our Legislature in the new criminal code. I therefore dissent from that holding although I agree that the defendant is entitled to a new trial.

I

The majority's heavy reliance upon *State v. Maik,* 60 *N. J.* 203 (1972), as supportive of its holding is wholly misplaced. The sole issue presented in *Maik* was whether a defendant's use of narcotics could be utilized to assert the insanity defense. In *dicta* the Court did state that as a general rule "a defendant will not be relieved of criminal responsibility because he was under the influence of intoxicants or drugs voluntarily taken." *Id.* at 214. The Court, however, also explicitly remarked that most jurisdictions

deem this "general rule" inapplicable where intoxication "prevent[s] the formation of a 'specific intent' required in the definition of a particular offense." *Id.* Although the *Maik* Court acknowledged the difficulty of distingushing between specific and general intent, it in no way indicated that the general rule should be abandoned.[1]

That *Maik* did not limit the intoxication defense to the crime of first-degree murder has been the holding of two different parts of our Appellate Division. In both *State v. Del Vecchio*, 142 *N. J. Super.* 359 (App. Div. 1976), and *State v. Atkins*, 151 *N. J. Super.* 555 (App. Div. 1977), the respective courts stated that *Maik* merely reaffirmed the long established rule that voluntary intoxication is not a defense to second-degree murder, and that it did not operate to negate such a defense when intoxication prevents the formation of an intent constituting an element of a non-homicide offense.

Pre-*Maik* caselaw also demonstrates that the intoxication defense is not confined to first-degree murder. *See, e.g., State v. Frankland*, 51 *N. J.* 221 (1968) (per curiam); *State v. White*, 27 *N. J.* 158 (1958); *State v. Kinlaw*, 150 *N. J. Super.* 70 (App. Div. 1977); *State v. Letter*, 4 *N. J. Misc.* 395 (Sup. Ct. 1926). In *Frankland* the defendant was charged with willfully setting fire to a motor vehicle in violation of *N. J. S. A.* 2A:89-2. Defendant denied that he had set the fire and further testified that he was so intoxicated at the time of the alleged offense that he could not remember his activities. The trial judge charged the jury *sua sponte* as to the defense of intoxication. On

---

[1] As Part IV of my opinion makes clear, *infra*, I, as does the majority, reject the illogical and unworkable "specific intent/general intent" dichotomy. *Maik* and other cases which speak in such terms are utilized herein solely to refute the majority's contention that New Jersey precedent supports the view that voluntary intoxication is a defense only in a first degree murder prosecution. My usage of such cases therefore should not be interpreted as indicating any acceptance of that dichotomy on my part.

appeal defendant's conviction was reversed by the Appellate Division on the ground that the intoxication charge conflicted with the defendant's general denial and therefore might have led the jurors to believe that the defendant admitted the act but sought to excuse it. This Court reversed and reinstated the conviction. We there held that, given the evidence that defendant had been drinking heavily, "the jury was entitled to be instructed on the effect of a finding by them that the defendant committed the act but did not know what he was doing." *Id.* at 223. We also noted that "had the trial judge failed to charge on this evidence of intoxication, the defendant well might argue that such failure was reversible error despite the lack of a request to so charge." *Id.* at 224. Had the Court been of the view that intoxication was a viable defense only to the crime of first-degree murder, the above holding clearly would not have been reached.

The *Frankland* holding was not a mere aberration. In *State v. White, supra,* we stated that "substantial authority supports the view that [intoxication] may lead to an acquittal when it excludes a required specific intent for the reason that in such circumstances the defendant did not commit the crime charged." 27 *N. J.* at 165. The Appellate Division, in *State v. Kinlaw, supra,* concluded that "as to a certain category of offenses, where specific intent is a necessary element, if the intoxication was such as to preclude the formation of such intent, the fact of intoxication may be shown to negate this element." 150 *N. J. Super.* at 73. *See also State v. Burrell,* 120 *N. J. L.* 277 (E. & A. 1938); *State v. Ghaul,* 132 *N. J. Super.* 438 (App. Div. 1975).

In order to compensate for the lack of contemporary caselaw supporting its view, the majority resurrects the common law rule that voluntary intoxication is not a defense to any crime. It is well settled, however, that common law principles are to be solely a guide and then only when they reflect current notions of proper jurisprudence. *State v. Toscano,* 74 *N. J.* 421 (1977). As shown

above, our caselaw has rejected the common law position. Further, it must be noted that this common law policy originated at a time when public drunkenness was itself a crime. It is perhaps understandable that courts in an earlier day would not allow an accused to utilize one criminal act as a defense to another. In 1975, however, our Legislature decriminalized public intoxication and adopted a broad policy of affording treatment. *N. J. S. A.* 26:2B–7 *et seq.* The Legislature specifically declared that:

[i]t is the policy of the State of New Jersey that alcoholics and intoxicated persons may not be subjected to criminal prosecution because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society.

[*N. J. S. A.* 26:2B–7]

The foregoing evidences the Legislature's recognition that alcoholism is a disease and should be dealt with through rehabilitation and treatment rather than imprisonment. The Legislature has thus abandoned the common law's premise that one who becomes intoxicated necessarily harbors an "evil" intent.

## II

Today's holding by the majority not only departs from precedent, it also stands logic on its head. This Court and the Legislature have long adhered to the view that criminal sanctions will not be imposed upon a defendant unless there exists a " 'concurrence of an evil-meaning mind with an evil-doing hand.' " *State v. Williams,* 29 *N. J.* 27, 41 (1959). The policies underlying this proposition are clear. A person who intentionally commits a bad act is more culpable than one who engages in the same conduct without any evil design. The intentional wrongdoer is also more likely to repeat his offense, and hence constitutes a greater threat to societal repose. A sufficiently intoxicated defendant is thus subject

to less severe sanctions not because the law "excuses" his conduct but because the circumstances surrounding his acts have been deemed by the Legislature to be less deserving of punishment.

It strains reason to hold that a defendant may be found guilty of a crime whose definition includes a requisite mental state when the defendant actually failed to possess that state of mind. Indeed, this is the precise teaching of cases allowing the intoxication defense in first-degree murder prosecutions. To sustain a first-degree murder conviction, the State must prove that the homicide was premeditated, willful, and deliberate. *State v. King,* 37 *N. J.* 285, 293–294 (1962). If the accused, due to intoxication, did not in fact possess these mental attributes, he can be convicted of at most second-degree murder, *see, e. g., State v. Polk,* 78 *N. J.* 539 (1979) ; *State v. Maik, supra,* 60 *N. J.* at 215; *State v. King, supra,* 37 *N. J.* at 297–298; *State v. DiPaolo,* 34 *N. J.* 279, 295–296, *cert.* den. 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). That offense, however, can be sustained on a mere showing of recklessness, *State v. Gardner,* 51 *N. J.* 444 (1968), and the necessary recklessness can be found in the act of becoming intoxicated.

Just as the lask of premeditation, willfulness, or deliberation precludes a conviction for first-degree murder, so should the lack of intent to rob or steal be a defense to assault and battery with intent to rob, or breaking and entering with intent to steal. The principle is the same in both situations. If voluntary intoxication negates an element of the offense, the defendant has not engaged in the conduct proscribed by the criminal statute, and hence should not be subject to the sanctions imposed by that statute.

### III

The majority ultimately grounds its conclusions on public policy considerations. It professes to be concerned with protecting society from drunken offenders. There are several

problems with this approach. First, the majority's opinion is not even internally consistent. Although intoxication is not to be given the status of a defense, the majority states that it can be considered to "buttress the affirmative defense of reasonable mistake." *State v. Atkins, supra,* 78 *N. J.* at 460. It is difficult to comprehend why the public would be less endangered by persons who become intoxicated and, as a result, commit alcohol-induced "mistakes" which would otherwise be criminal offenses, than by persons who get so intoxicated that they commit the same acts without any evil intent. In fact, it appears highly likely that the first group would encompass a larger number of persons and hence constitute a greater menace to society.

Second, the majority's opinion is not likely to deter the commission of alcohol-induced crimes. It is unrealistic to expect that before indulging in intoxicants people will consider the extent of their criminal responsibility for acts they might commit. In this respect, therefore, today's holding will not add to the public's safety.

The most important consideration, however, is that the standards for establishing the defense are extremely difficult to meet. Contrary to the implications contained in the majority opinion, it is not the case that every defendant who has had a few drinks may successfully urge the defense. The mere intake of even large quantities of alcohol will not suffice. Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he been sober. *See Final Report of the New Jersey Criminal Law Revision Commission,* Vol. II, Commentary (1971) at 68. What is required is a showing of such a great prostration of the faculties that the requisite mental state was totally lacking. That is, to successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases. I am confident that our judges and juries will be able to distinguish such unusual instances.

## IV

The majority and the commentators have criticized as elusive the "specific intent-general intent" dichotomy. *See, e. g.,* LaFave & Scott, *Criminal Law* (1972) § 45 at 344; Note, "Intoxication as a Criminal Defense," 55 *Colum. L. Rev.* 1210, 1218 (1955). The majority's difficulty in distinguishing the various mental states should not, however, be sufficient reason to mandate that *all* intoxicated defendants be incarcerated. The proper approach is to try and outline a more rational rule for applying the defense. I believe that such a rule is that enunciated in our new Code of Criminal Justice, effective September 1, 1979, which provides that intoxication will be a defense whenever it negates an element of an offense. *N. J. S. A.* 2C:98–4. The Act defines four mental states — purpose, knowledge, recklessness and negligence — one of which is necessary to establish guilt depending on the particular offense involved. *N. J. S. A.* 2C:2–2. Purpose and knowledge may be negated by intoxication, whereas recklessness and negligence may not. Moreover, the elements of recklessness or negligence may, where required by the definition of the crime, be satisfied by the recklessness implicit in becoming voluntarily intoxicated.

Although our current criminal law does not neatly compartmentalize *mens rea* into four such categories, the same type of analysis can be applied. Whenever a defendant shows that he was so intoxicated that he did not possess the requisite state of mind, he may not be convicted. Intoxication would not be a defense, however, to criminal offenses which may be established by recklessness or negligence as the carelessness in getting intoxicated would of itself supply the necessary mental state. This analysis would leave intact the long-standing rule that intoxication is not a defense to second-degree murder as that crime may be established by showing recklessness. *State v. Gardner,* 51 *N. J.* 444, 458 (1968).

Although the distinction between specific intent and general intent would be erased by the rule enunciated herein,

this does not mean that the different mental states implicit in our criminal law would become irrelevant. Some crimes — battery, for example — only require that the defendant intend the act that he has committed, while others — such as assault and battery with intent to kill — require that he also intend to bring about certain consequences. Certainly it would take a greater showing of intoxication to convince one that defendant had no intent to strike the victim than to show that he did not intend to kill. In the former case, one might well conclude that he must have intended his act unless he was unconscious. Indeed, this is the main reason why the "specific intent/general intent" dichotomy was first formulated.

Inasmuch as defendants in these two cases were charged with crimes requiring intent to rob or intent to steal, their convictions must be reversed and a new trial ordered at which they can attempt to persuade the jury that they lacked those mental states. We must respect the legislative judgment, made explicit in the new Criminal Code, that those persons who, due to intoxication, act without the intent required by law as an element of the crime, are not to be treated as are those who willfully commit the same acts. Accordingly, I would affirm the judgment of the Appellate Division in this case and the companion case, *State v. Atkins*, 78 *N. J.* 454, decided this day.

CLIFFORD and HANDLER, JJ., concurring in the result and PASHMAN, J., concurring in the result and dissenting.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.